UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Kelly McCarthy-Beam,

       Plaintiff,

       v.                              Civil Action No. 1:09-CV-272

Social Security Administration,
Commissioner,

       Defendant.

## REPORT AND RECOMMENDATION
(Docs. 12, 17)

Plaintiff Kelly McCarthy-Beam brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and reversal of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. Pending before the Court are McCarthy-Beam's motion seeking an order reversing the Commissioner's decision and remand for further proceedings (Doc. 12), and the Commissioner's motion seeking an order affirming his decision.  (Doc. 17.)

For the reasons set forth below, I recommend that McCarthy-Beam's motion to reverse and remand be GRANTED (Doc. 12) and that the Commissioner's motion to affirm (Doc. 17) be DENIED.

## Background

### I.    Procedural History

The Court first notes that Plaintiff filed a successful application for Supplemental Security Income Benefits ("SSI"), and is receiving benefits effective from her application

date of October 4, 2005.  (AR 342.)  The record of that application is not before the Court.  The Court now considers only the denial of Plaintiff's application for Disability Insurance Benefits.

On October 27, 2005, McCarthy-Beam applied for Disability Insurance Benefits, alleging that she became disabled on January 1, 2002 due to posttraumatic stress disorder, a sleeping disorder, "anxiety personality," addictions, and a "cyst on brain." (Administrative Record ("AR") 80, 101.)  The application was denied initially and upon reconsideration, and she timely requested an administrative hearing.  (AR 38-49, 51-71.) McCarthy-Beam appeared and testified at the hearing on May 7, 2009, and was represented by counsel.  (AR 17-32.)

On June 23, 2009, Administrative Law Judge ("ALJ") Ruth L. Kleinfeld issued a decision finding that McCarthy-Beam was not disabled under the Social Security Act during the period from the alleged onset date of January 1, 2002 until the last date that Plaintiff was insured for disability benefits, September 30, 2002.  (AR 5-14.)  The Appeals Council declined to review the decision, thus rendering the ALJ's decision the final decision of the Commissioner.  (AR 1-4.)  Having exhausted her administrative remedies, McCarthy-Beam timely filed the instant action on December 7, 2009.  Because McCarthy-Beam has already been determined disabled for SSI purposes, the Court will focus on the ALJ's determination that Plaintiff was not disabled during the earlier time period during which she was insured for disability benefits.

## II.   Personal History and Testimony

McCarthy-Beam was born in 1982, and was nineteen years old on the alleged disability onset date.  She completed the tenth grade in 1999, but did not attain a high school diploma.  McCarthy-Beam is single, and does not have any children.  (AR 21.) She experienced sexual abuse while assigned to foster care as a child, and abusive relationships within her family.  (AR 23.)  She has lived with her mother and been homeless and incarcerated, and was receiving in-patient psychiatric care at the time of her application.  (AR 98, 130, 174, 230-66.)

McCarthy-Beam has worked as a clerk/cashier, a waitress, and a motel housekeeper.  (AR 26-29, 94-96.)  At her hearing, McCarthy-Beam stated that her mother selected the onset date of January 1, 2002 in an attempt to coincide with the point in time when McCarthy-Beam stopped working.  (AR 22.)  It is unclear precisely when McCarthy-Beam stopped working.  She stated at her hearing that her last job was with Dunkin Donuts, and that the job ended "[a]bout 2002/2003."  *Id*.  Notes by a health care provider at Health Care Rehabilitation Services reflect that as of March 17, 2003, McCarthy-Beam was "no longer working."  (AR 383.)

The Social Security Administration's Field Office was unable to obtain a Disability Report from McCarthy-Beam because she was "temporarily hospitalized for a suicide attempt."  (AR 98.)  Instead, the Field Office interviewed McCarthy-Beam's mother, Diane Pawlick, in order to develop the claim.  (AR 101-108.)  Ms. Pawlick stated that McCarthy-Beam was unable to work because of posttraumatic stress disorder, "anxiety personality and sleeping disorder, addictions, [and] cyst on brain."  (AR 102.)

Mrs. Pawlick explained that these conditions limited McCarthy-Beam's ability to work because she "sleeps a lot it is hard to get her up [sic].  She has a hard time getting along with people because of her personality disorder.  Her migraines limit her ability to work as well."  (AR 102.)  Mrs. Pawlick also stated that McCarthy-Beam lost the job at Dunkin Donuts "for not showing up and not getting along with people[,]" and that she stopped working "due to . . . medical problems – couldn't get along with people – couldn't get up in the morning to go to work."  (AR 102.)

At her hearing before the ALJ on May 7, 2009, McCarthy-Beam stated that she attempted to get a high school diploma by "going onto probation and parole."  (AR 21.) She was unsuccessful, and stated that she quit because she could not be around people and "it was just too much for me."  (AR 21.)  McCarthy-Beam testified that she was separated from her mother from age nine until age sixteen.  (AR 22.)  She recounted that she was originally placed in foster care, but later lived with an aunt and her grandmother. (AR 23.)  McCarthy-Beam stated that prior to her removal from the family home, her father sexually abused her, and that she was physically and sexually abused while in foster care.  (AR 23.)  She testified that she was placed in a mental institution at age ten or eleven after her first suicide attempt, and was hospitalized a second time during the period that she lived with her grandmother for similar issues.  (AR 23.)  McCarthy-Beam testified that she began abusing drugs including heroin, cocaine, and alcohol within one or two years after returning to her mother's care, at approximately age seventeen.  (AR 24.)

McCarthy-Beam testified that as early as 2000, she experienced difficulty sleeping because of "dreams and nightmares about things that I had forgotten about that happened to me when I was younger." (AR 24.) She stated that her prescriptions for Lexapro, Zoloft, Klonopin, and Valium did not relieve her symptoms. (AR 25.) McCarthy-Beam described her difficulty with being around "too many people" and the resulting panic attacks, anxiety attacks, and paranoia. (AR 25.) When asked how many panic attacks she had in the 2002-2003 range, McCarthy-Beam stated "once a day, maybe once a week depending on how stressed out I was." (AR 29-30.) McCarthy-Beam stated that during that period, she typically only got out of the house one or two times per week. (AR 30). She explained "I had cystic acne too, which had a lot to do with it, but more of it was my anxiety. I can't be around a lot of people." (AR 30.) With respect to the "cyst" on her brain, McCarthy-Beam stated "I ended up finding out through my grandmother that I have a lump on this part of my brain . . . They don't know when I got it, but I've had headaches." (AR 30.)

## III.   Relevant Medical Evidence[1]

### A.      Montshire Clinical Services – Dr. James Napier – 2000

McCarthy-Beam began outpatient mental health treatment at Montshire Clinical Services in July 2000 shortly before her eighteenth birthday. (AR 346-58.) Of the four appointments for which she was scheduled with Dr. James Napier, she only attended two. (AR 357-58.) Dr. Napier diagnosed McCarthy-Beam with posttraumatic stress disorder

---

[1] The Court does not include a discussion of medical evidence that relates to treatment after the last date that McCarthy-Beam was insured for disability benefits.

and major depressive disorder at their first appointment on July 21, 2000.  (AR 348, 356.)

Dr. Napier stated that she met the full criteria for both disorders.  (AR 356.)  He also

noted McCarthy-Beam's "Extremely abusive childhood," and that she was raped twice at

age ten while in foster care and suffered physical abuse by her father and grandmother.

(AR 348, 353, 356.)  At the appointment, McCarthy-Beam complained of depression and

insomnia.  (AR 353.)  Dr. Napier recorded her symptoms as including flashbacks,

intrusive memories, psychological response to triggers, avoidance, anxiety, panic,

hyperarousal, and hypervigilence, among others.  (AR 353.)  In the section of his notes

titled "Past Psychiatric History," Dr. Napier wrote that McCarthy-Beam was hospitalized

twice "when young in [Massachusetts]," and that she lied about her symptoms " 'like her

[grandmother] told her to' so she would be placed [with her grandmother] by SRS."  (AR

353.)  Dr. Napier prescribed Wellbutrin and Clonazepam.  (AR 347.)  In his Axis V

evaluation, Dr. Napier assessed McCarthy-Beam with a GAF of 40.[2]

McCarthy-Beam did not attend her next appointment on August 2, 2000, but

resumed treatment on September 7, 2000.  (AR 357.)  Dr. Napier determined that she was

doing well with her medications, and noted that her anxiety had decreased and her mood

had improved.  (AR 357.)  Dr. Napier stated despite her complaints of insomnia, she

---

[2] GAF is measured on a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health-illness." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 30, 32 (4th ed. rev. 2000).  A GAF score of 31 to 40 corresponds to a major impairment in several areas, such as work, family relations, judgment, thinking, or mood.  *Id.* at 32.  A GAF score of 41 to 50 corresponds to serious impairment in social or occupational functioning.  *Id.*  An individual has "moderate difficulty" in social or occupational functioning with a GAF score of 51 to 60, and "some difficulty" in these areas but is generally functioning pretty well with a score of 61-70.  *Id.*

objectively appeared much improved with a brighter affect, near euthymic[3] mood, logical thought processes, and intact judgment.  (AR 357.)  Dr. Napier maintained the diagnoses of posttraumatic stress disorder and major depressive disorder.  (AR 357.)  He stated that McCarthy-Beam continued to complain of insomnia and "HA[4] (constant)".  (AR 357.)  He went on to note that she "appears to be doing well, [unintelligible word] Experiencing HA which may be [connected] to Wellbutrin or could be Lyme [disease]."  (AR 357.)  Dr. Napier prescribed Ambien to manage McCarthy-Beam's insomnia, and maintained the prescriptions for Wellbutrin and Clonazepam.  (AR 357.)  McCarthy-Beam did not attend her next scheduled appointment in October 2000, and was officially discharged from treatment by Dr. Napier in June 2001.  (AR 358.)

### B.      Uni-Care Health Services – 2003 (Grafton County Jail)

McCarthy-Beam was incarcerated or detained in the Grafton County Department of Corrections in 2003 and 2006.  (AR 230-66.)  On the July 7, 2003 medical intake "Questionnaire," McCarthy-Beam stated "yes" when asked whether she had any handicaps and whether she had ever been treated for depression, but "no" when asked if she ever tried to harm herself.  (AR 231.)  The same day, McCarthy-Beam was prescribed 100 milligrams of Zoloft.  (AR 261.)  The nurse's notes indicate that McCarthy-Beam presented a pill bottle with information on it reflecting that a prescription in McCarthy-Beam's name for 100 milligram tabs of Zoloft had been filled on January 3, 2003.  (AR

---

[3]  Euthymia is defined as "1.  Joyfulness; mental peace and tranquility.  2.  Moderation of mood, not manic or depressed."  STEDMAN'S MEDICAL DICTIONARY 678 (28th ed. 2006).

[4]  It is unclear what the abbreviation "HA" means.  The Court speculates that it may stand for "High Anxiety."

266.)  Treatment notes from July 8, 2003 show that McCarthy-Beam was given glucose

tabs to self-administer for hypoglycemia.  (AR 260.)  The chart covering July 2003 states

that McCarthy-Beam had diagnoses of cystic acne, depression, and diabetes.  (AR 262.)

### C.    Dartmouth-Hitchcock Medical Center – 2003

McCarthy-Beam presented herself twice to the Emergency Department at

Dartmouth-Hitchcock Medical Center in 2003 for treatment not related to her alleged

psychiatric problems.  On February 26, 2003, she reported to the Emergency Department

more than a week after a rollover car accident complaining of light headedness, chest

pain, and shortness of breath.  (AR 220.)  On April 26, 2003, McCarthy-Beam reported to

the Emergency Department with a tooth ache and was advised to use tooth wax.  (AR

222.)

McCarthy-Beam also had three office appointments with doctors associated with

the Dartmouth-Hitchcock Medical Center in 2003.  On June 23, 2003, she saw Sidney N.

Klaus, M.D. for a second opinion on the treatment of "cystic and inflamed papules and

nodules of the face."  (AR 189.)  Dr. Klaus diagnosed McCarthy-Beam with cystic acne

that was "severe, Grade IV . . . with no involvement of the back or chest."  (AR 189.)  Dr.

Klaus prescribed Accutane.  (AR 189.)  Dr. Klaus's notes state "[i]n general, she feels

well."  (AR 189.)

On August 13, 2003, McCarthy-Beam visited Dhaval Parikh, M.D. in order to

establish primary care.  (AR 191.)  Dr. Parikh wrote that she complained of "occasional

depression but denies any active suicidal ideation."  (AR 191.)  McCarthy-Beam reported

"erratic weight changes like loosing [sic] 40 lbs in a year and gaining back 20 lbs in a

month." (AR 191.)  Dr. Parikh noted McCarthy-Beam's self-reporting of her psychiatric diagnoses as including posttraumatic stress disorder (due to physical/sexual abuse in the past), attention deficit disorder, attention deficit and hyperactivity disorder, anxiety disorder, social disorder, sleeping disorder, and bipolar disorder.  (AR 191.)  Dr. Parikh also noted her self-reporting of medications as "[n]one now but was on zoloft, valium, klonopin, ambien previously." (AR 191.)  Dr. Parikh assessed McCarthy-Beam as twenty-one years old "with cystic acne and a very tenuous social situation." (AR 192.)  Dr. Parikh requested that McCarthy-Beam arrange for her medical records from other providers to be forwarded.

On September 9, 2003, McCarthy-Beam saw Dr. Parikh a second time and stated "[m]y grandmother told me today that I had a lump in my brain 4 years ago." (AR 194.)  The "lump" was found during a head CT scan following a motor vehicle accident.  (AR 194.)  McCarthy-Beam did not have any weakness in her extremities or urinary incontinence.  (AR 194.)  Dr. Parikh requested that she bring in the medical records from the hospital that performed the scan, and to seek medical attention immediately "if she felt dizzy, change in vision, weakness in any extremity, slurring of speech, passed out." (AR 194.)

### D.     Medical Consultants

#### i.     William Farrell, Ph.D. – April 12, 2006

Dr. William Farrell assessed McCarthy-Beam for two separate time periods, from January 1, 2002 until September 30, 2003, and from October 1, 2005 to October 1, 2006 in his Psychiatric Review Technique ("PRT") report dated April 12, 2006.  (AR 279,

267.)  After reviewing McCarthy-Beam's medical records, Dr. Farrell listed her

diagnoses as bipolar disorder, posttraumatic stress disorder, polysubstance abuse, and

borderline personality disorder.  (AR 279.)  Dr. Farrell concluded, "[n]eed fx[5] report and

*for earlier rating period* there is not enough evidence to rate.  [Claimant] did not return

Fx report despite DDS examiner efforts.  She failed to cooperate and not able to rate

severity of fxing.  Insufficient evidence."  (emphasis added) (AR 279.)

### ii.      Stephen Kleinman, M.D. – May 18, 2006

Stephen Kleinman, M.D. reviewed Dr. Farrell's PRT and memorialized his

findings on a form titled "Medical Consultant's Review of Psychiatric Review Technique

Form."  (AR 281-82.)  Dr. Kleinman agreed entirely with Dr. Farrell's assessment of

McCarthy-Beam.  (AR 281.)

### iii.      Edward Schwartzreich, M.D. – December 27, 2006

After the initial denial of benefits and upon reconsideration, Edward

Schwartzreich, M.D. reviewed the file on December 27, 2006.  (AR 326.)  Dr.

Schwartzreich affirmed Dr. Farrell's April 2006 assessment.  (AR 326.)  Prior to Dr.

Schwartzreich's review, additional Medical Evidence Reports ("MER") were added to

the file.  (AR 283-87 and 288-325.)  All of the new medical records related to McCarthy-

Beam's treatment in 2006.  Dr. Schwartzreich noted that the new records "[do] not

address the previous insufficient evidence issues."  (AR 326.)

---

[5] The Court reads "fx" to mean "function."

iv.    Edward Schwartzreich, M.D. – February 14, 2007

On February 14, 2007, Dr. Schwartzreich completed a PRT and a Mental Residual

Functional Capacity Assessment ("RFC") after another review of McCarthy-Beam's file.

(AR 328-41 and 342-45.)  Dr. Schwartzreich listed McCarthy-Beam's impairments as

"possible ADHD, BPAD I, PTSD, borderline PD, mixed DAA."  (AR 340.)  The PRT

assessment covered the period from January 1, 2002 until February 14, 2007.  (AR 328.)

Dr. Schwartzreich concluded that "[there] is insufficient evidence to rate severity on T2."

(AR 340.)  The Court interprets this statement to mean that because of the lack of

sufficient evidence, Dr. Schwartzreich was unable to rate the severity of McCarthy-

Beam's impairments during the period when she was insured for disability benefits under

title II of the Social Security Act.  Dr. Schwartzreich's RFC specifically assessed the time

period relating to McCarthy-Beam's application for SSI benefits under title XVI –

October 4, 2005 through February 14, 2007 – and offers no opinion evidence related to

the time period currently under consideration by the Court.  (AR 342.)

E.    New Medical Evidence

All of the medical evidence in subsections A-C above was acknowledged and

received into evidence by the ALJ at the beginning of the hearing in May 2009.[6]  At the

hearing, McCarthy-Beam's counsel noted that some recently submitted medical records

"did not make their way onto the disc . . .."  (AR 17.)  The newly submitted medical

_____

[6] The Court cites to the medical evidence above using the page number in the Administrative
Record.  However, the documents also are assigned an exhibit number and a page number.  The records
referenced in subsection A constitute the entirety of Exhibit 13F.  The records referenced in subsection B
are included within the forty-one pages of Exhibit 3F.  In any event, the ALJ received into evidence
Exhibits 1- to 3A, 1-10B, 1-5D, 1-13E, and 1-13F at the beginning of the May 7, 2009 hearing.  (AR 17.)

records were submitted on April 28 and 29, 2009, more than one week in advance of the hearing date.  (AR 18.)  In any event, the ALJ acknowledged "that there are substantial additional records[7] for the relevant period, and I'll review them when I get back [to the office]."  (AR 18.)

### i.   Psychotherapy – Patti Morgan, Ed.M. – 1998-2000

McCarthy-Beam engaged in psychotherapy with Patti Morgan, Ed.M. beginning October 29, 1998.[8]  McCarthy-Beam met with Ms. Morgan most weeks during the 1998-1999 academic school year.  Ms. Morgan titled the first three meetings as "Diagnosis and Evaluation."  (AR 359.)  The psychotherapy sessions began on November 17, 1998.  (AR 359.)

In the very first session, McCarthy-Beam stated that she had an "eating problem" and would binge on food.  She explained that she had an appointment later that day to get help from a physician to create a food plan.  Ms. Morgan wrote that they talked about "the emotional components of always feeling the compulsion to eat and with some prompting could attribute this problem to being starved as a child."  (AR 359.) McCarthy-Beam was absent from school on November 24, 1998 and missed her appointment, but Ms. Morgan met with McCarthy-Beam's guidance counselor and

---

[7] The newly submitted medical records were assigned exhibit numbers 14F and 15F.  Only the records in Exhibit 14F relate to the time period presently before the Court.  Exhibit 15F relates to medical care received in 2005.

[8] The Administrative Record's Table of Contents lists these medical records as from Health Care Rehabilitation Services.  Nothing on the records themselves indicates with what health organization or company Patti Morgan, Ed.M. is associated.  The Court notes that the sessions apparently took place at school during the school day, with the knowledge and permission of the school.

discussed education options "to help get her grades up" and "to enhance learning." (AR 360).

On December 10, 1998, Ms. Morgan noted that McCarthy-Beam had not been attending "special help after school." (AR 362.) McCarthy-Beam admitted "that she hasn't wanted to stay, but to go home and play video games." (AR 362.) In January 1999, an issue with one of McCarthy-Beam's friends escalated to the point that the students met with a mediator. (AR 364.) Ms. Morgan met with McCarthy-Beam in advance of the mediation in order to discuss "how she felt and what she wanted to communicate." (AR 364.) Ms. Morgan assessed that when asked to state what she took from the conversation, McCarthy-Beam "was not able to say back what she'd heard." (AR 364.) At the mediation, McCarthy-Beam left the room crying. (AR 364.) When Ms. Pawlick, McCarthy-Beam's mother, was apprised of the mediation by Ms. Morgan, she threatened to sue the school. (AR 364-65.) Ms. Pawlick calmed down and agreed not to sue, but Ms. Morgan noted that her plan was "[t]o continue to stay in close contact with [McCarthy-Beam]'s parents and the school asst' principal about the harrassment matter [sic]." (AR 365.)

At their next session[9] on January 12, 1999, Ms. Morgan wrote that McCarthy-Beam stated that "I felt so bad that I began to cry and thought I was having an emotional breakdown and would have to go the hospital." (AR 365.) They discussed "that her emotions may be heightened because the fear of loss of these friendships triggers all the

_____

[9] This session was unscheduled, and was at McCarthy-Beam's request to process the recent events. (AR 365.)

old hurts and losses of her family's breakdown years ago." (AR 365.) McCarthy-Beam was absent on January 14, 1999, the day of their next scheduled appointment. (AR 365.) When McCarthy-Beam was absent again on January 29, 1998, Ms. Morgan noted her intention to discuss the "frequent absences" with McCarthy-Beam's parents. (AR 367.)

On February 9, 1999, McCarthy-Beam recounted a recent family argument where McCarthy-Beam threw a glass at the floor, and her stepfather hit her sisters "to make them stop fighting." (AR 368.) Ms. Morgan wrote that McCarthy-Beam "felt that she handled the situation well, while I hold my breath trying to feel what this scene was like. Where are [McCarthy-Beam]'s feelings?" (AR 368.) By March, the family was calm (AR 369.), but in April McCarthy-Beam still felt treated unfairly by her family (AR 370-71). On April 15, 1999, McCarthy-Beam stated to Ms. Morgan, "I'm just sad that my mom doesn't give me love. There's no place for me so I just go to my room. I feel sometimes that I might as well not be alive." (AR 372.) Ms. Morgan and McCarthy-Beam then "did a contract around suicide as she has contemplated the means." (AR 372.) On April 29, 1999, McCarthy-Beam stated that "it had been a better week." (AR 373.) On May 6, 1999, Ms. Morgan assessed that McCarthy-Beam "is very sad and yet, 'determined' to get through all these challenges." (AR 373.)

Psychotherapy continued through May and June. On June 10, 1999, Ms. Pawlick contacted Ms. Morgan and described a fight between McCarthy-Beam and Ms. Pawlick's husband. (AR 376.) Ms. Pawlick requested that McCarthy-Beam be evaluated. (AR 376.) McCarthy-Beam was given a pass, but did not report to the session. (AR 377.)

14

Ms. Morgan found McCarthy-Beam, and the session followed.  (AR 377.)  McCarthy-Beam stated that her stepfather started the fight "by hitting her on the head," and that she "fought back in the car, scratching and hitting."  (AR 377.)  A session was scheduled during the summer, but Ms. Pawlick cancelled the appointment because "things [were] going so well, they didn't want to mess with things."  (AR 377.)  Ms. Morgan conveyed that McCarthy-Beam was very "low," and Ms. Pawlick responded that McCarthy-Beam "has nothing to be depressed about."  (AR 377.)

Ms. Morgan attempted to resume psychotherapy sessions with McCarthy-Beam in the fall of 1999 when school resumed.  McCarthy-Beam signed up for sessions, but then did not attend.  (AR 378.)  On October 7, 1999, Ms. Morgan contacted Ms. Pawlick on this issue, so that Ms. Morgan could assist with scheduling around instructors if needed.  (AR 378.)  On October 29, 1999, Ms. Morgan wrote that McCarthy-Beam would acknowledge Ms. Morgan in the halls, but would not respond to written notes.  Ms. Morgan planned to stop attempting contact.  (AR 378.)

On November 16, 1999, McCarthy-Beam reinitiated contact and scheduled a meeting for the following week.  (AR 379.)  Ms. Morgan wrote that McCarthy-Beam "is ready to return to counseling.  She has matured greatly since last year."  (AR 379.)  Over the course of the next three sessions, McCarthy-Beam stated that fights at home ended with her and her stepfather hitting each other, and that she was not sleeping.  (AR 380.)  However, Ms. Morgan noted that McCarthy-Beam "sometimes exaggerates and I struggle to know where the truth lies."  (AR 380.)

15

At the December 16, 1999 session, McCarthy-Beam stated that she was staying at the home of "the woman for whom she babysits. [She] related that she won't take money – she likes to do it for free . . . [She] has found a new home away from home." (AR 381.) On January 6, 2000, Ms. Morgan noted that McCarthy-Beam had "been ill and is behind in her school work." (AR 381.) Furthermore, McCarthy-Beam "seem[ed] to be living with this woman for whom she babysits," and goes home only on the weekends. (AR 381.) Ms. Morgan wrote "[w]hat am I missing here?" (AR 381.)

McCarthy-Beam was absent on the day of their next scheduled appointment, January 13, 2000. (AR 382.) On January 27, 2000, Ms. Morgan wrote that McCarthy-Beam was no longer responding when passes were sent to her for treatment, and that she was refusing treatment at this time. (AR 382.) Ms. Morgan stated that her plan was to close the chart. (AR 382.)

### ii.    Health Care Rehabilitation Services – 2003

In February 2003, McCarthy-Beam attempted counseling again. On February 17, 2003, two days before the rollover car accident that sent her to the Emergency Department at Dartmouth-Hitchcock Medical Center, McCarthy-Beam was an "office walk-in" at Health Care Rehabilitation Services.[10] (AR 383.) She had five scheduled sessions over the course of 2003. (AR 383-85.) McCarthy-Beam missed an appointment

---

[10] Nothing on the "Progress Notes" indicates the office or the location where the services were provided. The signatures, as well as the abbreviated credentials of the providers are unintelligible. The Court has accepted the Commissioner's assertion in the Table of Contents that the Progress Notes on pages 383 through 385 in the Administrative Record are in fact from Health Care Rehabilitation Services, the same organization with which Ms. Morgan was associated.

in August 2003, but was able to reschedule the next day.  (AR 384-85.)  The file was

apparently closed after a second missed appointment in early September 2003.  (AR 385.)

At her first session on February 17, 2003, the provider noted that McCarthy-Beam

had "social anxiety (previously debilitating) but presenting with appetite for life."  (AR

383.)  Furthermore, the visit was on a referral from the local probation department after

an "assault on boyfriend who was purportedly abusing her."  (AR 383.)  The provider

wrote, "[d]isappointed in almost every interpersonal relationship she has ever had

(currently ok with mother) so very tentative about engaging in life."  (AR 383.)  The

provider determined that McCarthy-Beam was a good candidate for psychotherapy, and

recommended ten to twenty sessions.  (AR 383.)

On March 17, 2003, the provider noted that McCarthy-Beam was "no longer

working and attributed this to her sisters."  (AR 383.)  McCarthy-Beam stated that she

had not slept for 6 days, but that she sought support for her return to school in the fall.

(AR 383.)  The Court notes that the handwriting in this entry is difficult to decipher.

On April 6, 2003, the provider stated that McCarthy-Beam "presents with

prominent PTSD anxiety and a probably bipolar [unintelligible] attention disorder."  (AR

384.)  The provider hoped to work with the probation department to coordinate services.

(AR 384.)

McCarthy-Beam missed her next scheduled appointment, but was seen the next

day by a different provider for what turned out to be her last session in 2003.  (AR 385.)

They discussed her strengths "and how she could use them to cope."  (AR 385.)  There

17

was apparently some discussion of suicide but McCarthy-Beam stated "I love myself too much for that." (AR 385.) The provider wrote "constant anxiety and panic attacks," but assessed McCarthy-Beam as "[r]esilient despite difficulty of current situation." (AR 385.)

## ALJ Decision

### I.     Five-Step Sequential Evaluation Process

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's "residual functional capacity" precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step requires the ALJ to determine whether the claimant can do "any other work."

18

20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or

her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a

"limited burden shift to the Commissioner" to "show that there is work in the national

economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)

(clarifying that the burden shift to the Commissioner at step five is limited, and the

Commissioner "need not provide additional evidence of the claimant's residual functional

capacity").

## II.    ALJ's Written Decision

Employing this five-step analysis, ALJ Kleinfeld first determined that McCarthy-

Beam did not engage in substantial gainful activity from January 1, 2002, the alleged

onset date, through September 30, 2003, the last day that McCarthy-Beam was insured

for disability benefits.  (AR 10.)  At step two, the ALJ found that through the date last

insured ("DLI"), McCarthy-Beam had medically determinable impairments including a

history of posttraumatic stress disorder, major depressive disorder, IV drug abuse,

occasional marijuana abuse, cystic acne, and hypoglycemia.  (AR 10.)  Although the

impairments were determinable, the ALJ found no impairment or combination of

impairments significantly limited McCarthy-Beam's ability to perform basic work-related

activities for twelve consecutive months.  (AR 11.)

ALJ Kleinfeld stated that the medically determinable impairments

could have been reasonably expected to produce the alleged symptoms;
however, the claimant's statements concerning the intensity, persistence
and limiting effects of these symptoms are not credible to the extent they

19

> are inconsistent with the finding that the claimant has no severe impairment
> or combination of impairments.

(AR 12.)  Furthermore, the ALJ stated that she gave "limited weight to the opinion of the state agency medical expert who concluded that there was insufficient evidence to make any findings" about McCarthy-Beam's mental limitations.  (AR 12.)  ALJ Kleinfeld also noted the lack of opinion evidence by a treating physician as to whether McCarthy-Beam was disabled prior to the DLI.

The ALJ next considered the four broad functional areas in section 12.00C of the Listings.  (AR 13; 20 CFR, Part 404, Subpart P, Appendix 1.)  The ALJ found no limitation in the first and fourth functional areas – activities of daily living and episodes of decompensation.  (AR 13.)  The ALJ found mild limitation in the second and third functional areas – social functioning and concentration, persistence, or pace.  (AR 13.)  However, the ALJ stated that in making those determinations of mild limitation, she was giving McCarthy-Beam the benefit of the doubt "although there is minimal evidence to support even this degree of limitation at this time."  (AR 13.)  The ALJ noted that while McCarthy-Beam received some outpatient in therapy in 2003, there had been no in-patient care or care of an emergent nature.  The ALJ concluded that on this basis, McCarthy-Beam was not disabled during the period from the alleged onset date through the DLI.

**<u>Standard of Review</u>**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

The reviewing court's role with respect to the Commissioner's disability decision is "'quite limited[,] and substantial deference is to be afforded the Commissioner's

decision.'"  *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7

(S.D.N.Y. Sept. 18, 2007) (quoting *Burris v. Chater*, No. 94 Civ. 8049, 1996 WL

148345, at *3 (S.D.N.Y. Apr. 2, 1996)).  The court should not substitute its judgment for

that of the Commissioner.  *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).  The

Second Circuit explained: "The entire thrust of judicial review under the disability

benefits law is to ensure a just and rational result between the government and a claimant,

without substituting a court's judgment for that of the Secretary, and to reverse an

administrative determination only when it does not rest on adequate findings sustained by

evidence having 'rational probative force.'"  *Williams v. Bowen*, 859 F.2d 255, 258 (2d

Cir. 1988) (quoting *Consol. Edison Co.*, 305 U.S. at 230).

    Therefore, if the reviewing court finds substantial evidence to support the

Commissioner's final decision, that decision must be upheld, even if substantial evidence

supporting the claimant's position also exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126

(2d Cir. 1990); *DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998).

## <u>Analysis</u>[11]

    McCarthy-Beam makes two primary arguments in support of her motion to

reverse the ALJ's determination or remand for further proceedings.  First, she contends

that the ALJ did not follow the requirements of Social Security Ruling 83-20 (hereafter

"SSR 83-20" or "the Ruling") by failing to determine the onset date of McCarthy-Beam's

---

[11]  The Court does not engage in an analysis of the ALJ's treatment of McCarthy-Beam's
hypoglycemia and cystic acne.  McCarthy-Beam does not argue that the findings were improper.  The
Court focuses its discussion on the medical evidence regarding those conditions and/or symptoms that are
relevant to McCarthy-Beam's existing disability and the determinations of an onset date.

disability.  (Doc. 12 at 6.)  Second, she argues that the ALJ's determination that

McCarthy-Beam was not severely mentally impaired was flawed because it is not

supported by substantial evidence.  (Doc. 12 at 11.)  The Commissioner responds that the

ALJ properly considered the evidence and that the severity determination is supported by

substantial evidence.  (Doc. 17 at 9-16.)  Furthermore, the Commissioner argues that the

ALJ complied with the dictates of SSR 83-20.  (Doc. 17 at 5-8.)

## I.      SSR 83-20 and Onset Date

In cases like this, where a claimant with an alleged onset date during the period in

which she was insured for disability benefits has already been found disabled under

another title of the Social Security Act, SSR 83-20 requires the ALJ to determine the

onset date of disability.[12]  The Ruling states:  "In addition to determining that an

individual is disabled, the decision[-]maker must also establish the onset date of

disability."  SSR 83-20, 1983 WL 31249, at *1 (S.S.A. 1983).  The onset date is defined

as "the first day an individual is disabled as defined in the [Social Security] Act and the

regulations."  *Id*.  In order to determine a disability onset date pursuant to SSR 83-20, the

ALJ must first determine whether the alleged impairment is of traumatic or non-traumatic

origin.  For disabilities of traumatic origin, the determination is relatively straightforward

– the onset date is the date of injury.  *Field v. Shalal[a]*, No. Civ. 93-289-B, 1994 WL

485781, at *2 (D.N.H. Aug. 30, 1994) (citing SSR 83-20, at *2).  For injuries of non-

---

[12]  "Social Security Rulings are agency rulings 'published under the authority of the
Commissioner of Social Security and are binding on all components of the Administration.'"  *Sullivan v.
Zebley*, 493 U.S. 521, 531, n. 9, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (quoting 20 C.F.R. § 422.408
(1989)).

traumatic origin, however, such as the mental disability at issue here, "the determination of onset [date] involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity." SSR 83-20, at *2.

The "starting point" in determining the onset date in a non-traumatic disability origin case, according to the Ruling, is the claimant's statement as to when the disability began. SSR 83-20, at *2. In this case, McCarthy-Beam states that her disability began on January 1, 2002. The ALJ must compare this date with the onset date, if any, which is established by the claimant's work history and medical evidence on the record. SSR 83-20, at *2. The Ruling provides the following guidelines for situations where the claimant's statement regarding the onset date of disability conflicts with the date established by the medical and/or work evidence:

> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.

*Id.* at *3.

While the Ruling clearly emphasizes the importance of objective medical evidence, it acknowledges that in some cases, the claimant's impairment may have become disabling prior to the date it was first diagnosed. *See* SSR 83-20, at *3; *Lichter v. Bowen*, 814 F.2d 430, 435 (7th Cir. 1987) ("[T]he critical date is the date of *onset* of disability, *not* the date of diagnosis.") (emphasis in original) (internal quotation and citation omitted). Therefore, although objective medical evidence is necessary to

24

establish the existence of a disabling impairment, *see, e.g.*, 20 C.F.R. § 404.1508; SSR

96-4p, 1996 WL 374187, at *1 (S.S.A. July 2, 1996), if a claimant has already been

found to suffer from a disabling impairment, objective medical evidence, while preferred,

is not essential to resolving the onset date of that disability.  One court explained:

> [SSR 83-20] makes clear that there are three factors that must be considered
> when determining the onset date of a claimant's disability:  "the applicant's
> allegations, work history, if any, and the medical and other evidence
> concerning impairment severity."  Nowhere in the SSR is there any
> suggestion that the absence of medical records establishing an onset date is
> fatal to an individual's disability claim.  In fact, the SSR provides just the
> opposite, specifically noting that in some cases it may be necessary to infer
> the onset date of a claimant's disability from non-medical evidence.

*Moriarty v. Astrue*, No. 07-cv-342-SM, 2008 WL 4104139, at *6 (D.N.H. Aug. 28, 2008)

(quoting SSR 83-20, at *2).

In this case, the ALJ did not follow the Ruling's mandate to infer an onset date of

McCarthy-Beam's disability.  Courts have held, however, that an ALJ's failure to

explicitly rely on SSR 83-20 is harmless error, to the extent that the dictates of the Ruling

are nonetheless followed.  *See, e.g., Briscoe*, 425 F.3d at 352 ("The ALJ did not refer to

SSR 83-20 specifically in this decision, but this omission by itself is not reversible error.

We must determine whether the ALJ nevertheless properly applied the requisite

analysis."  Moreover, courts have held that an ALJ's failure to follow SSR 83-20's

requirement to determine an onset date is harmless error, where the ALJ finds that the

onset date post-dated the DLI; substantial evidence supports that finding; and the decision

generally comports with the analysis set forth in SSR 83-20.  *See, e.g., Ware v. Barnhart*,

No. 03-170-B-W, 2004 WL 1529266, at *2-3 (D. Me. June 24, 2004) (while ALJ never

explicitly determined claimant's onset date, no reversible error resulted, as ALJ implicitly

found that onset date post-dated DLI; substantial evidence supported that finding; and

ALJ's decision comported with SSR 83-20 in other material respects).

## II.    SSR 83-20:  ALJ's Consultation of a Medical Advisor & Record Development

That the ALJ did not determine an onset date for McCarthy-Beam's acknowledged

disability is not fatal of its own accord.  The Court must determine whether the ALJ

nonetheless complied with the requirements of SSR 83-20.  The Court notes that SSR 83-

20 "imposes what might fairly be called heightened record-development duties." *Godsey*

*v. Astrue*, No. 08-410-P-S, 2009 WL 1873528, at *3 (D. Me. June 29, 2009).  In addition,

the Ruling specifically requires that, at the administrative hearing, the ALJ "should call

on the services of a medical advisor when [the] onset [date] must be inferred."  SSR 83-

20, at *3.  While SSR 83-20 does not mandate that a medical advisor be called in every

case, courts have construed this step to be "essential" when the record is ambiguous

regarding onset date. *Kelly v. Astrue*, No. 06-168-P-S, 2007 WL 2021923, at *7 (D. Me.

July 11, 2007) (citing *Katt v. Astrue*, No. 05-55043, 2007 WL 815418, at *1 (9th Cir.

Mar. 14, 2007) ("[A]n ALJ must call a medical expert if there is ambiguity in the record

regarding the onset date of a claimant's disability.  If the medical evidence is not definite

concerning the onset date and medical inferences need to be made, SSR 83-20 requires

the [ALJ] to call upon the services of a medical advisor . . . .") (citation and internal

quotation marks omitted).  For example, in *Grebenick v. Chater*, 121 F.3d 1193, 1200-01

(8th Cir. 1997), the Eighth Circuit stated:

> It is important to understand that the issue of whether a medical advisor is
> required under SSR 83-20 does not turn on whether the ALJ could
> reasonably have determined that [claimant] was not disabled before [DLI].
> Rather, when there is no contemporaneous medical documentation, we ask
> whether the evidence is ambiguous regarding the possibility that the onset
> of her disability occurred before the expiration of her insured status.  *If the
> medical evidence is ambiguous and a retroactive inference is necessary,
> SSR 83-20 requires the ALJ to call upon the services of a medical advisor*
> to insure that the determination of onset is based upon a legitimate medical
> basis.

(emphasis added) (citations and internal quotation marks omitted); *see also Briscoe ex*

*rel. Taylor v. Barnhart*, 425 F.3d 345, 353 (7th Cir. 2005) ("The ALJ acknowledged that

the medical evidence was inconclusive.  Rather than explore other sources of evidence, as

SSR 83-20 requires, the ALJ drew a negative inference at that point.").  Furthermore,

courts have noted the particular problem posed by mental impairments of a slowly

progressive nature.

> Because [Plaintiff's] mental impairment was of a slowly progressive nature,
> and the medical evidence was ambiguous with regard to the disability onset
> date, the Appeals Council could not have inferred an onset date based on an
> informed judgment of the facts without consulting a medical advisor.

*Spellman v. Shalala*, 1 F.3d 357, 363 (5th Cir. 1993).

In this case, the ALJ's decision does not comport with the requirements of SSR

83-20 because of the ambiguity of the onset date, and the ALJ's failure to consult a

medical expert in light of the newly submitted medical evidence as described below.

Though the Court is unable to assess the value of the evidence, it is reasonable – and

entirely consistent with the Ruling – that under review by a medical expert, the new

27

evidence could shed light on the issues of the onset date or the severity of McCarthy-Beam's disability within the relevant time period.

The medical evidence before the ALJ included therapy treatment records from 2000, and county jail and physical treatment records from 2003, as well as three consulting medical experts' opinions from 2006 and 2007 about those medical records. The consulting experts' opinions did not assist the ALJ in determining an onset date.  On April 12, 2006, William Farrell, Ph.D. stated that there was not enough evidence to rate the severity of McCarthy-Beam's conditions for the time period prior leading up to the DLI.  (AR 279, 267.)  Stephen Kleinman, M.D. reviewed Dr. Farrell's conclusions on May 18, 2006 and agreed with the conclusions.  (AR 281.)  When Edward Schwartzreich, M.D. reviewed the evidence and the opinions on December 27, 2006, additional medical records had been submitted, but they were not relevant to the time period under consideration here.  Dr. Schwartzreich found that the new records "[do] not address the previous insufficient evidence issues," and affirmed Dr. Farrell's April 2006 assessment. (AR 326.)  Dr. Schwartzreich examined the file a second time in February 2007 and completed a PRT and an RFC.  (AR 328-41, 342-45.)  On this further review, Dr. Schwartzreich affirmatively stated that there was "insufficient evidence" to rate severity in the period leading up to the DLI.  (AR 340.)

In her decision, the ALJ stated,

[a]s for the opinion evidence, I give limited weight to the opinion of the state agency medical expert who concluded that there was insufficient evidence to make any findings regarding the claimant's psychological limitations.

28

(AR 12.)  It is unclear which of the four medical opinions ALJ Kleinfeld assigns little

weight, but the Court notes that all four medical opinions are entirely consistent with

each other, and each agreed that there was insufficient evidence to make a determination.

ALJ Kleinfeld does not explain her reasoning for her assessment of the opinion evidence.

Additionally, the ALJ had the benefit of being able to review the newly submitted

medical records that included progress notes from therapy sessions in 1998 through 2000,

and 2003.  The ALJ found that McCarthy-Beam "was receiving some outpatient

treatment in early 2003, but stopped attending after only a few visits."  (AR 383-85.)  In

addition, ALJ Kleinfeld stated that after McCarthy-Beam's meeting with her new primary

care physician, "[n]o psychotropic medications were prescribed, and she was not taking

any at the time of examination."  (AR 12.)  At that examination, McCarthy was "alert and

oriented times three and was in no apparent distress."  (AR 12.)  The ALJ concluded that

though McCarthy-Beam had determinable mental impairments, they simply did not rise

to the level of a disability prior to her DLI.  (AR 13.)

McCarthy-Beam argues that this Court's decision in *Plumley v. Astrue*, 2:09-CV-

42, 2010 WL 520271 (D. Vt. Feb. 9, 2010) (Conroy, Mag. J.) controls, and alleges error

by the ALJ because of the failure to appoint a medical expert to review the most newly

submitted medical evidence.  (Doc. 12 at 8.)  The Court agrees.  In *Plumley*, this Court

found that the onset date of disability was ambiguous, and required the ALJ to consult a

medical advisor to assist in inferring an onset date.  *Plumley*, 2010 WL 520271, at *14.

29

The Commissioner argues that this case is distinguishable from *Plumley*.[13]  (Doc. 17 at

8.)  In *Plumley*, there were factual inaccuracies in a state agency physician's assessment,

and inconsistencies among the treating and consulting physicians' opinions.  This Court

found that those problems caused the record to be ambiguous.  The Commissioner argues

that because the same problems do not exist in this case, SSR 83-20 does not apply.

While the ambiguity is not of the same nature as in *Plumley*, the record presently

before the Court presents ambiguity that requires the application of SSR 83-20.  In this

case, the medical evidence within the rating period from January 1, 2002 until September

30, 2003 is limited, and the ALJ states that there is no medical evidence from 2003 until

McCarthy-Beam's hospitalization in 2005.  Because McCarthy-Beam has already been

found disabled under another title of the Social Security Act for a later period of time and

the limited nature of the medical evidence, the onset date of her disability must be

inferred.  Additionally, her mental impairment may be one that progresses slowly.  The

consulting experts and physicians reviewed a smaller universe of medical evidence than

that considered by the ALJ, and found "insufficient evidence" to make a determination

for the rating period.  New medical evidence from both before the rating period, and in

the period between the alleged onset date and DLI was submitted in a timely manner

---

[13]  On page 8 of the Commissioner's motion, the Commissioner states "In fact, unlike in *Plumley*, there is contemporaneous medical evidence suggesting that McCarthy-Beam's impairments *were disabling*."  (emphasis added) (Doc. 17 at 8.)  Though McCarthy-Beam takes great import from this statement in her reply brief (Doc. 18 at 3-4), the Commissioner's statement is inconsistent with the entirety of the rest of his motion.  The Commissioner has not responded to McCarthy-Beam's argument that the statement is a concession of some kind by the Commissioner.  The Court has determined that this statement must be a typographical error, marked by the omission of the word "not" between the words "were" and "disabling".  Otherwise, the statement would be a significant concession by the Commissioner, and a remand could occur on the consent of both parties.

prior to the hearing.  This series of events alone could have triggered the application of SSR 83-20.  Here, the ALJ determined that the newly submitted evidence did not support McCarthy-Beam's contention that she became disabled prior to the DLI.  In reaching her decision, the ALJ assigned limited weight to the expert opinions, and relied on her own review of the medical evidence - both newly submitted since the expert opinions were rendered and the evidence already in the file - to make her determination.

The Court finds that the newly submitted evidence taken with the existing evidence creates the ambiguity necessary to require the ALJ to consult a medical advisor for the following reasons.  The bulk of the newly submitted medical evidence is progress notes of counseling sessions that occurred at McCarthy-Beam's school during the 1998-99 and 1999-2000 school years.  The ALJ does not mention these records in her decision. McCarthy-Beam was sixteen years old at the outset of the sessions, well over three years before the alleged onset date.  The progress notes indicate a variety of concerns by the provider, Patti Morgan, Ed.M. on behalf of McCarthy-Beam.  Ms. Morgan notes McCarthy-Beam's frequent absences from school (AR 360, 365, 367.), and made a note to speak with McCarthy-Beam's parents about the absences (AR 367.).  A situation with school friends escalated to the point that the girls met with a mediator.  (AR 364.)  After the failed mediation session, Ms. Morgan noted that she would monitor the "harrassment matter [sic]" and stay in contact with McCarthy-Beam's parents and the assistant principal.  (AR 365.)

31

In January 1999, Ms. Morgan and McCarthy-Beam discussed how "the old hurts and losses of her family's breakdown years ago" continued to play out in current friendships.  (AR 365.)  McCarthy-Beam's family engaged in some significant arguments, including one where McCarthy-Beam threw a glass at the floor and her step-father hit her sisters, and another that prompted her mother to ask that McCarthy-Beam be evaluated.  (AR 368, 376.)  On April 15, 1999, Ms. Morgan entered into a "contract around suicide" with McCarthy-Beam "as she has contemplated the means."  (AR 372.) McCarthy-Beam did not maintain consistent appointments the following academic year. Ms. Morgan noted that McCarthy-Beam did not seem to be residing with her family during the week.  (AR 381.)  Ms. Morgan also noted her concern that McCarthy-Beam "sometimes exaggerates," and at their last appointment on January 6, 2003 wrote "[w]hat am I missing here?"  (AR 381.)

The Court cannot and does not assess the medical significance of these sessions. However, the Court notes that even in high school, McCarthy-Beam was attempting to navigate not only common high school concerns, but also the impact of her prior family history on her current relationships and interactions.  Of particular note to the Court were the following:  the discussion about suicide (especially in light of McCarthy-Beam's history of suicide attempts both before and after the time period now under consideration), the volatile nature of her home relationships and relationships at school and McCarthy-Beam's difficulty in managing them, and McCarthy-Beam's frequent absences from school.  Though these sessions occurred before the alleged onset date,

32

these records could assist a medical expert in understanding McCarthy-Beam's history of treatment and in making a determination as to onset date or severity.

ALJ Kleinfeld mentioned the newly submitted medical records for the time period currently under consideration in her decision, but minimized their importance. She described the evidence within the rating period as occurring "in early 2003" and ceasing "after only a few visits." (AR 12.) However, as early as April 2003, the notes include serious diagnoses consistent with McCarthy-Beam's disability and what may be significant symptoms. On April 6, 2003, the provider noted that she "present[ed] with prominent PTSD anxiety and a probable bipolar . . . attention disorder." (AR 384.) By August 28, 2003, McCarthy-Beam complained of "constant anxiety and panic attacks." (AR 385.) This entry may be inconsistent with Dr. Parikh's notation on August 13, 2003 that she only complains of "occasional depression."[14] (AR 191.) In any event, the ALJ's decision does not mention the existence in 2003 – prior to the alleged onset date – of these diagnoses or symptoms. Instead, the ALJ relied on her new primary care physician's assessment that despite "several psych issues . . . she was alert and oriented . . ." (AR 12.)

The Court finds ambiguity as to onset date exists in light of the Commissioner's finding that McCarthy-Beam is disabled as of 2005, the previous medical experts' assertions that there was insufficient evidence to make a finding during the rating period, and newly submitted medical evidence that could support McCarthy-Beam's contentions

---

[14] Despite this notation, the Court notes that within the same appointment notes, Dr. Parikh wants her to see "psych as soon as they can see her." (AR 193.)

within the rating period.  Given the issues raised in the progress notes from McCarthy-Beam's schooling, and the possible progressive nature of McCarthy-Beam's mental impairment, the 2003 session notes prior to the DLI contribute significantly to the Court's finding of ambiguity in the onset date.  Without the assistance of a medical expert, the ALJ's assessment of these records was improper under SSR 83-20.

The ALJ assessed the other medical evidence in 2003 (in the file prior to the new submissions) stating that

> [n]o psychotropic medications were prescribed and she was not taking any at the time of the examination.  She reported that she had taken Zoloft, valium, Klonopin, and ambien previously, but the dates were not specified. There is no record of the evaluation or its conclusions or even if it took place . . .

(AR 12.)  While this statement is correct, the ALJ previously stated that McCarthy-Beam was taking Zoloft in July 2003 while she was incarcerated.  (AR 10.)  There does not appear to be any concern about whether a prescription existed by corrections officials. The medical records from July 2003 from the Grafton County Jail indicate that McCarthy- Beam gave the nurse a bottle from a refill on January 9, 2003 for 100 milligram tabs of Zoloft.  (AR 266.)  This apparently provided the basis for the Zoloft that she was given during her time at the Grafton County Jail.  (AR 261.)  While the ALJ notes that there is no record of the evaluation that led to the reported prescriptions (AR 10.), McCarthy-Beam's primary care physician noted in August 2003 that "[s]he had a physician at APD who has been following her" (AR 191.).  This notation is important because it indicates that there may have been additional medical and/or psychiatric care

34

provided to McCarthy-Beam during the relevant time period.  Furthermore, given the

heightened record-development duties of SSR 83-20, it is unclear what efforts the ALJ

made to determine what "APD" is, and whether there were additional medical records

that could be examined.  All of this evidence – which was in the group of evidence

reviewed by at least some of the consulting medical experts – provides context to the

newly submitted evidence from 2003.

The Court also notes the significant physical and sexual abuse suffered by

McCarthy-Beam at the hands of family members and foster care providers documented in

her medical records.  The newly submitted evidence may provide fuller context of the

course of McCarthy-Beam's symptoms and efforts at treatment leading up to the rating

period under consideration.  Again, the Court is unable to assess the medical significance

of the evidence.  Under SSR 83-20, a medical expert is needed to interpret the medical

significance, if any, of this evidence and its impact on an onset date determination.

Furthermore, the reasons that support the Court's finding of ambiguity as to onset date

also support a finding that the ALJ's decision that McCarthy-Beam was not disabled

during the relevant time period is not supported by substantial evidence.  For these

reasons, the Court recommends remand.

## III.    Credibility

McCarthy-Beam argues that the ALJ's decision is not supported by substantial

evidence because, at least in part, the ALJ improperly assessed McCarthy-Beam's

credibility.  (Doc. 12 at 15-16.)  The Commissioner argues that the ALJ's conclusion

was proper and that it is the Commissioner "who is charged with resolving evidentiary conflicts and determining credibility issues."  (Doc. 17 at 15, citing *Richardson v. Perales*, 402 U.S. at 399.)  Since the Court is recommending remand on other bases, the Court does not reach this issue.  However, the Court notes that the ALJ did not find that McCarthy-Beam's testimony or subjective evidence conflicted somehow with specific medical evidence.  Instead, the ALJ stated that McCarthy-Beam's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible *to the extent they are inconsistent with finding that the claimant has no severe impairment* or combination of impairments  . . ."  (emphasis added) (AR 12.).

It is within the ALJ's discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the symptoms alleged.  *Lugo v. Chater*, 932 F. Supp. 497, 503 (S.D.N.Y. 1996) (*citing Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)).  In this case, the ALJ seems to have asserted that McCarthy-Beam's statements are not credible simply because they conflict with the ALJ's finding regarding severity.  The ALJ does not state how or why McCarthy-Beam's assertions may be inconsistent with the objective medical evidence.  To the extent that the ALJ relied on her own finding in order to diminish McCarthy-Beam's credibility, this may have been improper – especially in light of the ALJ's failure to comply with SSR 83-20 and consult with a medical expert as to how to interpret the objective medical evidence.

On remand, before determining the severity of McCarthy-Beam's disability, the ALJ is instructed to infer an onset date with the assistance of a medical advisor.

## Conclusion

For these reasons, I recommend that the Court GRANT McCarthy-Beam's Motion to reverse (Doc.12), that the Commissioner's motion (Doc. 17) be DENIED, and that the matter be REVERSED and REMANDED for further proceedings in accordance with this Report and Recommendation.

Dated at Burlington, in the District of Vermont, this 17th day of December, 2010.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.  *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).